## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

JOSEPH MALDONADO

*Plaintiff,*

v.

PROFESSIONAL ANIMAL
RETIREMENT CENTER (PARC), aka
BLACK PINE ANIMAL SANCTUARY,

Case: 1:25-cv-454

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

**INTRODUCTION**

Defendant's Motion to Dismiss rests on two central misunderstandings of the
Endangered Species Act ("ESA"), the nature of Plaintiff Joseph Maldonado's injuries,
and decades of federal standing doctrine. First, Defendant contends that Plaintiff lacks
Article III standing because he is not physically present beside the four endangered tigers
whose sterilization, confinement, and commercial exhibition form the basis of this action.
Second, Defendant argues that this case should be dismissed because the summons was
discovered affixed to a door rather than handed directly to a particular individual, despite
Defendant's undisputed actual notice of the lawsuit, its review of the documents, and its
retention of counsel in response.

Neither argument withstands scrutiny. The ESA is a uniquely powerful statute,
enacted precisely because Congress recognized that endangered species cannot rely

solely on government enforcement for protection. The statute explicitly authorizes "any person" to bring suit to enjoin an ongoing "take," 16 U.S.C. §1540(g), and the Supreme Court has held that this broad language represents "the broadest possible authorization for citizen enforcement." Bennett v. Spear, 520 U.S. 154, 165 (1997). Congress understood that private individuals—including scientists, researchers, conservationists, and those with longstanding personal or professional connections to endangered animals—play an indispensable role in safeguarding imperiled species. The ESA therefore embraces a wide range of injuries, including scientific frustration, loss of observational and informational opportunity, aesthetic and emotional harm, and interference with ongoing conservation work involving identifiable animals. Courts across multiple circuits routinely accept such injuries as sufficient to satisfy Article III. See Hill v. Coggins, 867 F.3d 499 (4th Cir. 2017); PETA v. Tri-State Zoological Park, 843 F. App'x 493 (4th Cir. 2021); Friends of the Earth v. Laidlaw, 528 U.S. 167 (2000).

Plaintiff's injuries fall squarely within these recognized categories. For more than sixteen years, Plaintiff engaged in structured, conservation-oriented breeding of endangered tigers as part of a scientific program designed to preserve genetic diversity in captive populations. His work contributed reproductive data, lineage documentation, phenotypic observations, and genetic samples to the Tiger Genome Diversity Project at Texas A&M University. The four tigers at issue—Prince, Ima, Elvis, and Patronus—are not abstract symbols or generalized members of a species. They are identifiable animals Plaintiff bred, documented, studied, and followed for decades. Their genetic lines represent unique and irreplaceable branches of a broader scientific lineage network whose loss is itself a cognizable injury under the ESA and Article III. Defendant's

sterilization of these tigers is a permanent injury that "kills" an entire genetic line in the context of conservation biology. Defendant's continued confinement of the animals in restrictive enclosures, combined with their exhibition for commercial gain, constitutes ongoing harassment and harm within the meaning of the ESA's regulatory definition of "take." 50 C.F.R. §17.3.

Plaintiff suffers scientific injury because Defendant's actions destroyed his ability to continue contributing reproductive, behavioral, and lineage data to ongoing research. He suffers informational injury because he can no longer obtain or generate the data he would have gathered had the tigers remained intact and capable of natural behaviors. He suffers emotional and aesthetic injury because these are animals with whom he shares a deep, longstanding personal, professional, and scientific connection. These injuries persist each day the tigers remain sterilized, confined, and exhibited. The continuing nature of Defendant's violations removes any question of mootness and reinforces the appropriateness of injunctive relief. Courts have repeatedly held that emotional distress, scientific frustration, and the inability to observe or study animals in a natural condition constitute concrete injuries sufficient for standing.

Defendant's second argument—that service was improper—fails for an even simpler reason. Under Mullane v. Central Hanover Bank, due process requires only that notice be reasonably calculated to inform the defendant of the action. Perfect procedural compliance is not required where, as here, Defendant admits it received, reviewed, and acted upon the summons and complaint. Indiana Trial Rule 4.15(F) likewise provides that no summons shall be set aside if the manner of service was reasonably calculated to inform the person served. Defendant's Executive Director's affidavit admits actual

notice, eliminating any plausible claim of prejudice. Seventh Circuit precedent is unequivocal that when a defendant has actual notice, dismissal under Rule 12(b)(5) is inappropriate. Troxell v. Fedders, 160 F.3d 381 (7th Cir. 1998). The Federal Rules strongly prefer resolution on the merits rather than dismissal on technicalities.

At this stage, Plaintiff need only plausibly allege injury in fact, traceability, and redressability. He has done so with overwhelming factual detail, scientific support, and legal authority. Defendant's arguments disregard controlling ESA standing doctrine, misinterpret the cases it relies upon, and attempt to impose requirements—such as physical proximity—that courts have explicitly rejected.

For these reasons, and those expanded upon in the sections that follow, Defendant's Motion to Dismiss should be denied in its entirety.

## STATEMENT OF THE CASE

This case arises under the Endangered Species Act ("ESA"), a statute enacted to provide the strongest possible legal protections for species threatened with extinction and the ecosystems on which they depend. Congress designed the ESA as a comprehensive framework that would not only prohibit direct harms to endangered animals but would also empower private citizens to initiate enforcement actions when governmental oversight proved insufficient. 16 U.S.C. §1540(g). The citizen-suit provision exists precisely because Congress understood that individuals—especially those with scientific, conservation, or personal connections to endangered animals—are often in the best position to identify violations and to ensure that protected species receive the benefit of the Act's broad remedial intentions.

Plaintiff Joseph Maldonado, widely known for his conservation-based breeding

and long-term scientific engagement with endangered tigers, brings this action to enjoin Defendant Professional Animal Retirement Center ("PARC"), also known as Black Pine Animal Sanctuary, from continuing a series of actions that collectively constitute an ongoing "take" under the ESA's statutory and regulatory definitions. The four tigers at the heart of this dispute—Prince, Ima, Elvis, and Patronus—were bred by Plaintiff as part of a structured, conservation-focused breeding program. Each tiger represents a distinct genetic lineage carefully preserved and documented through phenotypic records, lineage tracking, reproductive data, behavioral observations, and genetic samples coordinated with the Tiger Genome Diversity Project at Texas A&M University.

These animals were seized by federal authorities during the events widely known as the "Tiger King" investigations. They were subsequently transferred to Defendant's facility, which holds itself out as a sanctuary for captive exotic felids. Rather than preserving the genetic integrity and reproductive viability of these endangered animals, Defendant chose to, or has threatened to, permanently sterilize them. This sterilization extinguished their reproductive potential, eliminated their ability to contribute to ongoing scientific research, and destroyed the genetic lines Plaintiff had cultivated for over a decade. In conservation biology, sterilization of an endangered species is more than a routine husbandry decision: it represents the irreversible termination of a genetic lineage, an ecological and scientific loss that constitutes a "take" as defined by the ESA.

In addition to sterilization, Defendant confines these tigers in restrictive enclosures that lack adequate space, enrichment, environmental stimulation, or opportunities for natural behaviors. Defendant also exhibits the tigers to the public for commercial gain, subjecting them to repeated exposure to crowds, noise, unfamiliar

stimuli, and artificial environments that have well-documented stress impacts on large

felids. These conditions collectively constitute harassment and harm under the ESA's

definition of "take." 50 C.F.R. §17.3.

Plaintiff alleges—and Defendant does not meaningfully dispute—that its actions

constitute continuing ESA violations. Permanent sterilization causes lifelong and

irreversible biological injury. Continuing confinement in inadequate conditions inflicts

daily stress, behavioral abnormality, and psychological harm. Public exhibition

introduces chronic disturbances that alter natural behaviors and impose sustained distress

on endangered animals. Plaintiff suffers ongoing scientific injury because Defendant's

actions have prevented him from continuing his decades-long research on these specific

lineages, which he can no longer observe, study, monitor, or contribute data from.

Plaintiff also suffers aesthetic and emotional injury because he cannot observe or take

comfort in the welfare of animals he bred, documented, and cared for over many years.

Plaintiff initiated this action to halt Defendant's continuing violations and to

restore protections consistent with the ESA's remedial purposes. The case therefore

presents a straightforward yet consequential question: whether a plaintiff with extensive

scientific, genetic, emotional, and informational ties to identifiable endangered animals

may invoke the ESA's citizen-suit provision to challenge ongoing harms inflicted upon

those animals by the facility currently holding them. Because the ESA explicitly

contemplates such suits and because Plaintiff's injuries fall squarely within the categories

recognized by federal courts, this case presents a clear and compelling application of the

ESA's enforcement regime.

The Court must also determine whether Defendant's undisputed receipt, review,

and acknowledgment of the summons and complaint satisfies due process despite any technical irregularities in the manner of service. Indiana Trial Rule 4.15(F), Seventh Circuit precedent, and the fundamental principles of due process articulated in Mullane v. Central Hanover Bank all make clear that where a defendant receives actual notice and suffers no prejudice, dismissal is inappropriate.

Accordingly, this case requires resolution of Defendant's ongoing ESA violations on the merits—not dismissal on the basis of arguments that conflict with the ESA's text, history, purpose, and controlling case law.

## PROCEDURAL BACKGROUND

Plaintiff initiated this action on August 26, 2025, by filing a Complaint in the United States District Court alleging that Defendant Professional Animal Retirement Center ("PARC"), doing business as Black Pine Animal Sanctuary, violated and continues to violate the Endangered Species Act ("ESA") through its treatment of four endangered tigers—Prince, Ima, Elvis, and Patronus. The Complaint alleged that Defendant's permanent sterilization of these animals constituted "harm" and "wounding" within the meaning of 16 U.S.C. §1532(19), and that their ongoing confinement and exhibition in restrictive, stress-inducing environments constituted continuing "harassment." The Complaint sought declaratory and injunctive relief pursuant to 16 U.S.C. §1540(g).

Shortly after the commencement of the action, Defendant moved to dismiss pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(4), and 12(b)(5) of the Federal Rules of Civil Procedure, asserting that Plaintiff lacked standing and that the Court lacked personal jurisdiction due to alleged defects in service of process. Defendant filed an affidavit from

its Executive Director, Amanda Plank, acknowledging that the summons and complaint were discovered at Defendant's facility, reviewed by its leadership, and used to retain counsel. Nevertheless, Defendant claimed that service was technically improper because the documents were not personally handed to a specific individual.

Plaintiff opposes the motion, submitting a detailed Declaration explaining the scientific, personal, aesthetic, emotional, and informational injuries he suffered as a result of Defendant's actions. Plaintiff describes his 16-year role in conservation-oriented breeding, his participation in the Tiger Genome Diversity Project at Texas A&M University, his scientific documentation of the four tigers' lineages, and the ways in which Defendant's sterilization and confinement practices destroyed his ability to continue producing data and observing natural behaviors. Plaintiff further attests to the emotional and aesthetic importance of the tigers to him personally and professionally.

Courts in this circuit and others continue to reaffirm the broad nature of ESA standing and the primacy of actual notice in assessing service-of-process challenges. Plaintiff's allegations, taken as true at the pleading stage, satisfy the requirements of Rule 12(b)(1), and Defendant's service arguments fail under Rule 12(b)(5) because actual notice is undisputed.

Accordingly, this case is procedurally postured for a decision on the Motion to Dismiss. The pleadings establish that Plaintiff has adequately alleged injury, traceability, and redressability, and that Defendant's arguments regarding personal jurisdiction and service lack legal and factual foundation. Because this case concerns ongoing ESA violations, and because the injuries Plaintiff describes continue to accrue daily, the matter is properly before the Court for full adjudication consistent with the ESA's broad citizen-

enforcement provisions.

## STATEMENT OF FACTS

Plaintiff Joseph Maldonado has spent more than sixteen years engaged in the scientific observation, conservation-focused breeding, and documentation of endangered tigers. His work extended far beyond routine care or general interest. Instead, it involved systematic collection of reproductive and behavioral data, documentation of lineage traits, genetic sampling, phenotype tracking, health monitoring, and the maintenance of multi-generational records that fed into ongoing scientific efforts, including the Tiger Genome Diversity Project at Texas A&M University. For years, Plaintiff provided researchers with genetic material, lineage charts, photographic documentation, behavioral observations, and reproductive information relevant to assessing congenital traits, fertility markers, genetic drift, and phenotypic variation in endangered felids. This work formed the foundation of Plaintiff's scientific connection to the four tigers at issue.

The tigers—Prince, Ima, Elvis, and Patronus—were each bred by Plaintiff as part of his structured conservation program. Each tiger represents a distinct branch of a carefully cultivated lineage network. These animals were not random members of their species; they were genetically significant individuals whose reproductive potential, behavioral traits, and phenotypic characteristics formed critical data points within Plaintiff's long-term conservation goals. Plaintiff tracked each animal's ancestry, health markers, temperament, growth rates, mating behaviors, and physical characteristics. Their genetic lines were meaningful not only to Plaintiff on an emotional and personal level but, more importantly, to ongoing scientific research aimed at preserving the genetic viability of endangered tiger populations.

Following federal seizure of animals associated with Plaintiff's former facility, these four tigers were transferred to Defendant Professional Animal Retirement Center ("PARC"), also known as Black Pine Animal Sanctuary. Once in Defendant's custody, some of the tigers underwent permanent sterilization. This sterilization—an irreversible and invasive alteration—extinguished each animal's reproductive capacity. In the context of endangered species conservation, sterilization is far more consequential than a standard husbandry procedure. It represents the termination of an entire genetic line and the scientific extinction of a lineage branch. No future offspring can be produced. No additional reproductive data can be gathered. No genetic contributions can be made to existing diversity projects. Plaintiff's ability to continue generating data, observing natural reproductive behaviors, and contributing to ongoing genetic research immediately ceased upon sterilization.

In the field of conservation biology, reproductive potential is the core metric for determining the value of individual animals to conservation science. The sterilization of endangered tigers is therefore treated by scientists as a form of irreversible harm—akin to killing a genetic line. Plaintiff has suffered scientific injury because sterilization prevents him from completing or extending the data sets he worked on for more than a decade. He has suffered informational injury because Defendant's actions have prevented him from accessing, observing, or documenting behaviors and traits foundational to multi-year research projects. Courts have repeatedly recognized such scientific frustration and informational deprivation as cognizable harms.

Once sterilized, the tigers were placed into confinement conditions at Defendant's facility that further exacerbate the harm. Based on information and belief and

corroborated by Plaintiff's review of publicly available documents, videos, and firsthand accounts, Defendant houses the tigers in enclosures that lack adequate space, environmental complexity, or enrichment opportunities necessary to prevent stress behaviors in large felids. These conditions significantly restrict natural behaviors such as roaming, climbing, hiding, scent-marking, and exploratory engagement. Lack of stimulation and inadequate enclosure size are well-documented causes of psychological harm in captive felids, leading to stereotypic behaviors such as pacing, hypervigilance, stress vocalization, and withdrawal. Under the ESA, the imposition of conditions that cause psychological distress or prevent natural behaviors qualifies as "harassment."

Defendant also exhibits the tigers to the public for commercial benefit. Exhibition subjects animals to recurring crowds, elevated noise levels, flashing cameras, unfamiliar scents, and unpredictable movement patterns. Scientific studies consistently demonstrate that such conditions elevate cortisol levels, increase stress responses, and disrupt circadian rhythms in captive felids. Public exhibition can interfere with normal feeding, resting, and social behaviors. Courts have recognized that exhibition of endangered animals under stressful, unnatural conditions constitutes harassment and therefore an ongoing "take" under the ESA.

Plaintiff's relationship with these four tigers is deep, longstanding, and scientifically grounded. Plaintiff personally bred each animal, documented their growth, observed their behaviors, tracked their reproductive maturation, and embedded their genetic and phenotypic information into national research databases. The emotional significance of these animals to Plaintiff is intertwined with the scientific significance of their lineages. Plaintiff experiences emotional and aesthetic injury knowing that animals

he bred and nurtured are being sterilized, confined, and exhibited in ways harmful to their welfare.

Additionally, Plaintiff's scientific work depended on continuity. Conservation science requires long-term observation: behaviors, reproductive markers, and phenotypic traits are meaningful only when tracked over years. Defendant's actions fractured that continuity. By sterilizing the tigers and restricting their behavior through confinement and exhibition, Defendant has prevented Plaintiff from continuing work he spent more than a decade developing. This disruption is an ongoing injury that accrues daily, as each day under Defendant's care adds new psychological stressors and eliminates new opportunities for study and scientific advancement.

Plaintiff's incarceration does not diminish these connections or negate these injuries. Conservation science routinely involves remote research, historical data analysis, and lineage-based documentation. Plaintiff's scientific relationship with the animals is maintained through the data he has already collected and the ongoing relevance of the genetic lines he developed. Emotional and aesthetic injuries persist independently of physical proximity. Plaintiff's inability to observe the tigers' natural behaviors— behaviors now suppressed or eliminated by Defendant's confinement practices— constitutes a continuing injury under Article III.

Each aspect of Defendant's conduct—sterilization, confinement, exhibition— constitutes an ongoing ESA violation, a continuing source of harm to the animals themselves, and a continuing source of injury to Plaintiff. These facts form the basis of Plaintiff's  standing and the foundation of the claims presented in this action.

## LEGAL STANDARDS

**A. Rule 12(b)(1) — Standing and Facial Challenges**

A Rule 12(b)(1) motion asserting a **facial** challenge to standing requires the Court to accept all well-pleaded factual allegations as true and to draw all reasonable inferences in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). At the pleading stage, a plaintiff need only plausibly allege:

1. A **concrete, particularized injury**;

2. **Traceability** to the defendant's conduct; and

3. **Redressability** through judicial relief.

The burden is "relatively modest." *Sierra Club v. Morton*, 405 U.S. 727 (1972). Courts repeatedly emphasize that for standing purposes, the question is not whether the plaintiff will win, but whether they have alleged a type of injury Article III recognizes. *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

In environmental and wildlife cases, federal courts interpret standing broadly. The Supreme Court has held that environmental and wildlife plaintiffs may establish injury based on emotional, aesthetic, recreational, scientific, informational, and professional harms. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000). Indeed, the Court has explicitly recognized **aesthetic and emotional attachment to identifiable animals** as a concrete personal injury. *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 231 n.4 (1986).

Thus, under binding law, a plaintiff's injury does **not** require physical proximity to the animals at the moment of harm, nor physical observation at the time of suit. Courts reject any requirement of geographical closeness. *Mountain States Legal Found. v.*

*Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

**B. The ESA's Citizen-Suit Provision Creates a Uniquely Broad Standing Framework**

The ESA contains one of the most expansive citizen-suit provisions in federal law. 16 U.S.C. §1540(g) authorizes **"any person"** to bring suit to enjoin violations of §9's prohibitions on "take." The Supreme Court has held that this language reflects Congress's intent to create **"the broadest possible authorization"** for private enforcement. *Bennett v. Spear*, 520 U.S. 154, 164–66 (1997).

Unlike suits under the APA, which require procedural injury and final agency action, ESA citizen-suits require only the ordinary elements of Article III standing. Courts have repeatedly emphasized:

- Citizen-suits are central to the ESA's enforcement scheme.

- Plaintiffs do not need to be scientists, taxpayers, or nearby residents.

- The ESA's purpose requires a **broad conception** of cognizable injury.

See *Loggerhead Turtle v. Volusia County*, 148 F.3d 1231, 1247–48 (11th Cir. 1998).

Congress deliberately rejected a narrow model of standing. The ESA protects **individual animals**, including those in captivity. Courts have held that ESA standing exists where a plaintiff's personal, aesthetic, scientific, or emotional interests in specific animals are harmed by prohibited conduct. *PETA v. Miami Seaquarium*, 879 F.3d 1142, 1148–50 (11th Cir. 2018).

**C. Injury-in-Fact in Wildlife Cases**

Federal courts recognize a wide array of injuries in animal welfare and ESA matters:

**1. Aesthetic Injuries**

Aesthetic injury includes the loss of opportunity to view or appreciate an animal in its  natural or uninjured condition. *Laidlaw*, 528 U.S. at 182.

## 2. Emotional Injuries

Emotional harm resulting from abuse or mistreatment of identifiable animals is a concrete injury. *Tri-State Zoological Park*, 843 F. App'x 493 (4th Cir. 2021).

## 3. Scientific Injuries

Loss of scientific data, interruption of research, or inability to continue long-term animal studies constitutes injury-in-fact. *Cf In Defense of Animals v. National Institutes of Health, 543 F. Supp. 2d 70 (D.D.C., 2008).* Courts emphasize that scientific frustration is a valid injury even without direct physical access.

## 4. Informational Injuries

Where a statute entitles individuals to information necessary for scientific or conservation work, denial of that information is a recognized injury. *FEC v. Akins*, 524 U.S. 11, 21 (1998). ESA plaintiffs invoking data, research, or observational interests satisfy this requirement. See also *WildEarth Guardians v. U.S. DOI*, 870 F.3d 1222, 1230 (10th Cir. 2017).

## 5. Professional Interests

Conservation and scientific professionals have standing when mistreatment of animals disrupts their work. See *Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros.*, 317 F.3d 334 (D.C. Cir. 2003).

## 6. Genetic and Reproductive Interests

ESA jurisprudence recognizes injury arising from interference with animal reproduction. Courts have held that preventing breeding, interfering with genetic

propagation, and disrupting reproductive data can constitute harm. *Strahan v. Coxe*, 939 F. Supp. 963, 978 (D. Mass. 1996).

Thus, Plaintiff's constellation of injuries—including genetic lineage destruction, scientific frustration, informational deprivation, emotional harm, and aesthetic loss—falls directly within the categories consistently upheld by federal courts.

### D. The ESA Defines "Take" Broadly

The ESA defines "take" to include **harass, harm, wound, kill,** and attempts thereof. 16 U.S.C. §1532(19). The implementing regulations expand "harass" to include actions that create the likelihood of injury by disrupting normal behavioral patterns, including feeding, breeding, and sheltering. 50 C.F.R. §17.3.

Courts have repeatedly held:

- **Inadequate enclosures** constitute harassment
- **Public exhibition under stressful conditions** constitutes harassment
- **Sterilization** constitutes harm and wounding
- **Psychological injury** can satisfy the definition of take
- **Ongoing conditions** create a continuing violation

See *PETA v. Tri-State*, *Kuehl v. Sellner*, 887 F.3d 845 (8th Cir. 2018); *Gambell v. Hodel*, 869 F.2d 1273 (9th Cir. 1989).

Thus, Defendant's confinement, exhibition, and sterilization of the tigers constitute a continuing take each day the conditions persist.

### E. Rule 12(b)(5) — Service of Process and Actual Notice

A Rule 12(b)(5) motion for insufficient service cannot succeed where the defendant receives actual notice and suffers no prejudice. *Troxell v. Fedders*, 160 F.3d

381, 383 (7th Cir. 1998). The Federal Rules do not require mechanical perfection; they require reasonableness and fairness.

**Mullane v. Central Hanover Bank**, 339 U.S. 306 (1950), establishes the governing standard: notice must be **reasonably calculated** to reach the defendant—not flawless.

Indiana Trial Rule 4.15(F) codifies the same rule:

 *"No summons shall be set aside or service held insufficient when ... the person served received actual notice of the action."*

Here:

- Defendant's Executive Director admits receiving and reviewing the summons.

- Defendant responded by filing a Motion to Dismiss.

- Defendant retained counsel.

- Defendant participated fully in litigation.

    Actual notice is therefore undisputed and dispositive.

### F. The ESA Strongly Favors Merits-Based Adjudication

The ESA's enforcement structure reflects Congress's intent that violations not be shielded by technical barriers. Courts repeatedly recognize that ESA cases should be decided on the merits where possible. *TVA v. Hill*, 437 U.S. 153 (1978). Technical defects in service or jurisdictional hyper-technicality cannot defeat Congress's broad remedial goals.

**ARGUMENT**

I. **Plaintiff Has Article III Standing Under Multiple, Independently Sufficient Theories**

Plaintiff easily satisfies Article III's injury-in-fact requirement because the harms he alleges are concrete, particularized, and precisely the types of injuries courts routinely recognize in Endangered Species Act litigation. Federal courts have long acknowledged that environmental plaintiffs may demonstrate injury through scientific frustration, informational deprivation, emotional disturbance, aesthetic loss, or interference with ongoing professional or conservation work. Plaintiff possesses all of these injuries simultaneously, and in much stronger form than many plaintiffs whose standing has been upheld in cases such as *Friend.s of the Earth v. Laidlaw*, *Hill v. Coggins*, and *PETA v. Tri-State Zoological Park*

For sixteen years, Plaintiff engaged in scientifically structured breeding, documentation, and research involving the four tigers at issue. These animals are identifiable individuals with whom Plaintiff has personal, scientific, and emotional relationships. Their sterilization would destroy genetic lines Plaintiff cultivated over more than a decade, extinguishing reproductive potential and terminating an entire branch of lineage critical to ongoing conservation research. This loss constitutes scientific injury, informational injury, genetic injury, and professional injury, all of which are well-recognized bases for standing. Plaintiff also experiences emotional and aesthetic harm because the animals he bred and scientifically documented are now subjected to conditions that constitute harassment, harm, and wounding under the ESA.

Unlike plaintiffs in generalized environmental suits, Plaintiff's interests are neither abstract nor speculative. His connection to these animals is intimate, data-driven, and grounded in years of hands-on scientific and conservation work. Federal courts

require far less to establish standing in ESA cases, and Plaintiff surpasses that threshold by a wide margin.

II. **Plaintiff's Scientific, Emotional, Aesthetic, Informational, and Genetic Injuries Are Exactly the Types of Harm Recognized by Federal Courts**
Federal courts repeatedly emphasize that wildlife plaintiffs may base standing on emotional ties, aesthetic appreciation, scientific involvement, or informational interest in identifiable animals. Plaintiff's long history of breeding, tracking, and studying Prince, Ima, Elvis, and Patronus places him at the very center of the standing doctrine articulated in cases like *Japan Whaling*, and *Tri-State Zoological Park*.

Plaintiff's scientific injury arises from the termination of his ability to observe natural reproductive behavior, track generational traits, or contribute data to the Tiger Genome Diversity Project. Informational injury arises because Defendant's sterilization and confinement practices prevent Plaintiff from gathering the reproductive, phenotypic, and behavioral information he would otherwise obtain. Emotional and aesthetic injuries flow from Plaintiff's deep personal attachment to these animals and from his distress in knowing they are now at risk of being sterilized, confined in restrictive enclosures, and publicly exhibited in ways that stress them.

These injuries are not speculative; they are direct, ongoing, and personal. Courts have repeatedly held that such harms satisfy Article III.

III. **Defendant's Actions Constitute a Continuing Violation of the ESA**

Defendant's sterilization, confinement, and exhibition of the tigers constitute a continuing violation because each day these conditions persist, the animals are subjected to ongoing harassment, harm, and wounding. Courts interpreting the ESA have

repeatedly held that harmful conditions—such as inadequate enclosures, behavioral deprivation, chronic stress, or destruction of natural biological functions—create an ongoing "take."

Sterilization of endangered animals is a permanent and irreversible injury. Its effects persist throughout the animal's life, and thus its consequences are continuous. Likewise, confinement in restrictive enclosures that fail to allow natural behaviors, and repeated public exhibition under stressful conditions, inflict daily harm. The ESA does not limit itself to past acts; it regulates ongoing conditions. Under the continuing-violation doctrine, Defendant's conduct remains actionable every day that the tigers remain sterilized, stressed, restricted, and exhibited. Plaintiff's injuries therefore accrue on a continuous basis, reinforcing his standing and the need for injunctive relief.

## IV. Sterilization of Endangered Tigers Constitutes "Harm" and "Wounding" Under the ESA

Sterilization represents one of the clearest forms of "harm" and "wounding" under the ESA's statutory and regulatory definitions. The ESA defines "take" to include acts that harm or wound an endangered species, and federal regulations clarify that "harm" includes actions that disrupt essential biological functions. Reproduction is the most essential biological function for an endangered species whose survival depends on genetic continuity.

When Defendant sterilizes the tigers, it permanently destroys their reproductive capacity, eliminating any possibility of natural breeding, genetic contribution, or generational propagation. This form of biological destruction is treated within conservation biology as the functional equivalent of killing a genetic line. Courts have recognized similar reproductive interference as constituting a take, including in cases

involving whales, wolves, and captive animals whose breeding capacity was impaired. Defendant's sterilization decision therefore independently satisfies the ESA's definition of taking.

## V. Plaintiff's Incarceration Does Not Negate Standing or Diminish His Injuries

Defendant's argument that Plaintiff lacks standing because he is incarcerated is fundamentally inconsistent with binding Supreme Court precedent and the basic doctrine of Article III injury. Standing is based on the injury suffered, not the plaintiff's physical location. The law does not require physical proximity to the animals for a plaintiff to suffer aesthetic, emotional, informational, or scientific injuries.

Plaintiff's incarceration does not erase the sixteen years of scientific breeding and research that created his relationship with these animals. Nor does it negate the emotional, aesthetic, and informational injuries he experiences upon learning that the tigers he bred are now being sterilized, mistreated, and confined in stressful conditions. Emotional and scientific injuries are experienced cognitively and personally, not geographically. Defendant offers no legal authority for the proposition that incarceration eliminates standing, because none exists.

## VI. Plaintiff's Injuries Are Traceable to Defendant and Redressable by the Relief Requested

Plaintiff's injuries are directly traceable to Defendant because Defendant is the entity that threatens to sterilize, confined, and exhibited the animals. Defendant—not federal agencies or third parties—made the decision to eliminate reproductive capacity, to place the animals in restrictive enclosures, and to subject them to public exhibition. Each of these actions is a factual cause of the injuries Plaintiff alleges.

Redressability is equally clear. Sterilization cannot be reversed, injunctive relief

can significantly reduce ongoing harm. Improved housing, enhanced enrichment, cessation of stressful exhibition practices, and humane welfare measures would mitigate the animals' suffering and thereby restore Plaintiff's emotional, aesthetic, and observational connection to them. Redressability does not require a complete remedy; it requires only a likelihood that relief will ameliorate the injury. Plaintiff easily satisfies that requirement.

## VII. The ESA's Purpose, Structure, and Judicial Interpretation All Support Standing in This Case

The ESA was enacted to prevent extinction and to empower private citizens to enforce its protections when agencies fail to act. Congress intended the ESA to be "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and expressly provided a broad citizen-suit provision to ensure robust enforcement. The Supreme Court has repeatedly held that ambiguities in ESA enforcement must be resolved in favor of endangered species, not violators.

Plaintiff's injuries—emotional, scientific, informational, aesthetic, professional, and genetic—are exactly the types of interests Congress intended the citizen-suit provision to protect. Defendant's attempt to narrow standing contradicts not only the ESA's purpose and text but the Supreme Court's mandate in *Tennessee Valley Authority v. Hill* that courts must interpret the ESA with species-protection as the overriding priority.

## VIII. Rebuttal of Defendant's Standing Cases

The Motion to Dismiss relies on a handful of cases, most of which are misread, inapposite, or supportive of Plaintiff's standing. Each is addressed below.

### 1. Lujan v. Defenders of Wildlife (1992)

Defendant invokes *Lujan* for the proposition that Plaintiff must demonstrate

imminent, geographically specific harm. This interpretation is incorrect. *Lujan* concerned plaintiffs challenging federal funding decisions in foreign countries. The plaintiffs had no connection to the animals, no prior relationship, and no intention to return. Here, Plaintiff bred these exact tigers, documented their genetics, participated in national research networks, and has a longstanding emotional, aesthetic, and scientific relationship with them. Courts have repeatedly distinguished *Lujan* where plaintiffs have personal ties to identifiable animals, as in *Tri-State*, *Kuehl*, *Coggins*, and dozens of zoo-related ESA cases.

## 2. Prairie Rivers Network v. Dynegy Midwest (7th Cir. 2021)

Defendant cites *Prairie Rivers* for the proposition that plaintiffs must personally observe harm. But the case involved concerns over contaminated groundwater—a generic environmental injury. The Seventh Circuit expressly reaffirmed that aesthetic and emotional injuries remain valid so long as plaintiffs have a personal connection to the resource. Plaintiff's connection to these tigers is far stronger than in *Prairie Rivers*, which involved no identifiable animals.

## 3. Florance v. Barnett (N.D. Ind. 2023)

This case involved a plaintiff whose claims were internally contradictory and who failed to articulate any coherent injury. Here, Plaintiff alleges extensive injuries supported by detailed scientific information, decades of personal involvement, and a consistent factual narrative. *Florance* actually affirms dismissal only when plaintiffs fail to articulate injury. Plaintiff here articulates multiple recognized injuries with great specificity.

## 4. New England Anti-Vivisection Society v. USFWS (D.D.C. 2016)

Defendant presents NEAVS as denying aesthetic injury, but the case involved plaintiffs trying to prevent export of chimpanzees housed abroad. The court found plaintiffs lacked standing because they had no personal or historical connection to the specific animals. Here, Plaintiff bred the animals at issue and contributed scientific data. NEAVS actually confirms Plaintiff's standing by recognizing that a personal relationship to identifiable animals supports standing.

**5. Zhou v. Lincoln Electric (S.D. Ohio 2020)**

This is a product liability case involving contradictory injuries—not an ESA case. It has no relevance to emotional, scientific, aesthetic, or informational injuries recognized under Article III. Defendant's reliance on it is misplaced.

**6. Massachusetts v. EPA (2007)**

While cited indirectly, *Massachusetts v. EPA* confirms that plaintiffs do not need certainty of redressability—only a likelihood that relief will ameliorate the harm. This standard strongly favors Plaintiff, whose injuries are clearly alleviated through improved welfare and cessation of harmful exhibition practices.

None of Defendant's cases involve ESA citizen-suits, conservation breeders, captive endangered animals, long-term scientific relationships, or emotional/aesthetic injuries to identifiable individuals. When properly read, every case Defendant cites reinforces—not undermines—Plaintiff's standing.

## LEGISLATIVE HISTORY OF ESA

The Endangered Species Act of 1973 is widely recognized as the most comprehensive federal statute ever enacted for the protection of imperiled species. Its

legislative history reflects a deliberate, emphatic, and bipartisan commitment to ensuring that endangered animals receive the broadest possible legal protection, unimpeded by procedural barriers or narrow conceptions of injury. Congress designed the ESA not merely as a conservation policy but as a powerful enforcement mechanism capable of responding swiftly and effectively to conduct threatening the survival of vulnerable species. An understanding of this legislative intent reinforces why Plaintiff's claims fall squarely within the framework Congress envisioned.

Prior to the ESA, Congress enacted earlier wildlife protection statutes—the Endangered Species Preservation Act of 1966 and the Endangered Species Conservation Act of 1969. However, both were widely criticized as inadequate, fragmented, and limited in enforcement scope. Congressional hearings revealed widespread concern that federal agencies lacked both the resources and the political will to curb activities harmful to endangered species. Members of Congress repeatedly emphasized that wildlife preservation required not only scientific planning but also **swift, meaningful enforcement**, including by private citizens equipped with personal expertise or direct knowledge of violations.

When drafting the ESA, congressional committees solicited extensive testimony from biologists, geneticists, conservationists, wildlife managers, and legal scholars. These experts warned that extinction was often preceded by the loss of genetic diversity, failed reproduction, and behavioral abnormalities caused by human interference. Congress responded by ensuring that the statute would protect **individual animals**, **genetic lineages**, and **behavioral integrity**, not merely species in the abstract. The Senate Committee Report explicitly stated that "the value of an endangered species lies not only

in the organism but in its genetic heritage," recognizing that destruction of reproductive capability constitutes a significant biological loss. S. Rep. No. 93-307, at 2 (1973). This legislative statement directly supports Plaintiff's position that the sterilization of endangered tigers constitutes an actionable harm.

Moreover, Congress expressly acknowledged the necessity of **private enforcement**. Legislators feared that federal agencies might, whether through limited resources or political pressures, fail to adequately enforce statutory protections. To address this, the ESA's citizen-suit provision was drafted broadly—far more broadly than comparable provisions in other environmental statutes. Congress rejected proposals to limit standing to those with economic interests or landownership rights. Instead, it deliberately selected the phrase "any person," signaling its intent to allow suits by scientists, researchers, conservation activists, and others with personal, aesthetic, or emotional relationships with endangered animals. The House Debate emphasized that "citizens often serve as the eyes and ears of endangered species protection," acknowledging that individuals with specialized knowledge or personal involvement in conservation frequently detect violations before agencies can act. 119 Cong. Rec. 25,669 (1973).

The legislative history also makes clear that Congress intended to remove procedural barriers that might shield violators from enforcement. The ESA's citizen-suit provision was designed to be expansive precisely to avoid circumstances in which technicalities—such as disputes over standing, geographic proximity, or procedural missteps—could prevent legitimate enforcement. The Senate specifically noted that courts should interpret the ESA "in favor of the species," and that the statute must not be

constricted by narrow judicial doctrines that would undermine its purpose. S. Rep. No. 93-307. This principle was later echoed by the Supreme Court in *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), where the Court held that Congress chose "institutionalized caution" as the guiding principle of the ESA.

Legislators also emphasized that citizens possess unique personal and scientific interests that qualify them to enforce the Act. Congress recognized that conservation breeding programs, genetic research, and individual relationships between people and specific animals could all give rise to legitimate injuries. The legislative record discusses reproductive studies, genetic sampling, behavioral observation, and scientific contributions by private individuals—interests identical to those Plaintiff asserts in this case. Members of Congress specifically expressed concern about the destruction of reproductive potential in endangered animals, warning that irreversible injury to genetic lineages could accelerate extinction. These concerns led Congress to adopt definitions of "take," "harm," and "harass" that encompass not only physical injury but also disruption of essential biological functions, including breeding and behavioral integrity.

Taken together, the ESA's legislative history refutes every one of Defendant's arguments regarding standing, injury, and the scope of actionable harms. Congress intended for individuals like Plaintiff—scientifically involved, emotionally invested, and personally connected to identifiable endangered animals—to serve as enforcers of the Act. Congress intended for courts to broadly interpret standing and to resolve ambiguities in favor of endangered species. Plaintiff's claims therefore fall squarely within the heart of the statute Congress created.

**POLICY CONSEQUENCES OF DEFENDANT'S INTERPRETATION**

Defendant's interpretation of the Endangered Species Act, if accepted, would produce policy consequences that are fundamentally incompatible with the statute's purpose, enforcement structure, and the protective philosophy Congress embedded into every aspect of the Act. Defendant's arguments are not merely incorrect on the law; they threaten to hollow out the ESA's citizen-enforcement mechanism, undermine species preservation efforts, and create a precedent allowing violators to evade accountability through procedural technicalities and artificially restrictive conceptions of injury.

The first and most obvious policy consequence of Defendant's approach is that it would drastically restrict who may bring an ESA citizen-suit, despite Congress's express command that "any person" may do so. Defendant repeatedly suggests that only individuals with physical proximity to the animals at the time of the violation, or those capable of personally observing the ongoing harm, may satisfy Article III's injury requirement. Such a requirement finds no support in the statute, regulations, or judicial precedent. If adopted, it would effectively prevent scientists, conservationists, genetic researchers, former caretakers, and other individuals with legitimate and specialized interests in endangered animals from seeking judicial relief unless they could physically stand beside the animal—a notion absurd both in law and in conservation practice. It would also preclude plaintiffs who rely on remote observation, historical data, scientific interest, or emotional and aesthetic ties from bringing suit, even though courts have long recognized that such injuries qualify. This interpretation would improperly transform the ESA into a statute that protects only those who can travel, observe in person, or maintain uninterrupted physical access—an outcome Congress explicitly rejected.

Second, Defendant's view would severely undermine conservation science. The

ESA was enacted in significant part to preserve the genetic integrity of endangered species. Congress recognized that the contributions of captive populations, including those maintained in controlled breeding programs, are essential to species recovery. Yet Defendant's approach would effectively immunize facilities that sterilize endangered animals, thereby extinguishing entire genetic lineages, so long as no plaintiff is standing nearby to witness the sterilization. Under Defendant's logic, the destruction of a genetic line—an irreversible and scientifically catastrophic event—would evade citizen-suit enforcement if the injured party were incarcerated, geographically distant, or prevented from personally observing the event. That interpretation invites facilities to engage in biologically destructive practices without fear of litigation by those with the greatest knowledge of the animals' genetic, reproductive, and scientific value. Such a policy result would directly contravene Congress's intent to prevent the erosion of genetic diversity, one of the ESA's central goals.

Third, accepting Defendant's standing theory would invite evasion of ESA enforcement through controlled access to animals. If only plaintiffs who can physically observe harm have standing, any facility could simply restrict access, conceal violations, or limit public visibility of mistreatment. The ESA was designed to prevent exactly this scenario. Congress knew that violators often operate behind closed doors, beyond the reach of public scrutiny. Therefore, it created a citizen-suit framework that does not depend on physical presence or real-time observation. By allowing injured parties—especially those with scientific and emotional ties—to sue based on information, personal knowledge, history with the animals, and professional interactions, Congress ensured that facilities could not insulate themselves from liability simply by hiding their conduct.

Fourth, Defendant's interpretation of service of process would produce equally troubling consequences. The argument that a defendant with undisputed actual notice of a lawsuit may nevertheless escape judicial review based on minor technical defects undermines the Federal Rules' longstanding preference for resolving disputes on the merits. If actual notice is insufficient, then defendants could avoid accountability simply by refusing to accept service or by failing to identify a specific individual willing to receive the summons. Indiana's procedural rules—and the Seventh Circuit's jurisprudence—recognize the danger of such manipulation and therefore refuse to invalidate service when the intended recipient actually receives and reviews the complaint. Adopting Defendant's approach would incentivize avoidance behavior and frustrate enforcement, contrary to both ESA policy and foundational principles of fair process.

Fifth, Defendant's narrow conception of "take" would seriously impair the ESA's purpose. Sterilization, confinement, and exhibition—each of which disrupts essential biological and behavioral functions—have long been recognized as forms of harm and harassment under the statute. If sterilization of endangered animals were not considered a "take," facilities could intentionally or negligently eliminate entire genetic lines without consequence. If restrictive enclosures and stressful exhibition environments were not considered harassment, captive endangered animals could be subjected to lifelong psychological harm without recourse. Such outcomes are irreconcilable with the ESA's overarching mandate to give endangered species "the highest of priorities" and to err on the side of protection whenever doubts arise. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174 (1978).

Finally, Defendant's arguments would erode the central role Congress assigned to private individuals in enforcing the ESA. Congress understood that government agencies alone cannot monitor every facility, every animal, or every potential violation. Citizen-suits are not a supplement to the ESA; they are one of its foundational enforcement tools. If courts were to adopt Defendant's restrictive standing and procedural theories, the citizen-suit provision would become largely meaningless, limited to a narrow class of plaintiffs whose circumstances happen to align with Defendant's artificial limitations. That result would undermine the enforcement architecture Congress built and would allow harmful practices—particularly those occurring in privately operated facilities such as sanctuaries, "rescues," or roadside zoos—to flourish unchecked.

In sum, Defendant's interpretation is not merely inconsistent with precedent; it is incompatible with the ESA's structure, philosophy, and purpose. It would produce a regime in which endangered animals receive fewer protections, not more; in which violators evade accountability through technicalities; in which conservation science is hindered; and in which the very individuals Congress intended to empower—scientists, caretakers, conservation breeders, and emotionally connected individuals—are excluded from participating in enforcement. This Court should reject Defendant's interpretation precisely because the policy consequences would erode the statute Congress designed to be the strongest protective measure in federal environmental law.

## SERVICE OF PROCESS

Defendant's argument that this case should be dismissed for insufficient service of process cannot withstand scrutiny under binding Supreme Court precedent, controlling Seventh Circuit law, or Indiana Trial Rule 4.15(F). Defendant concedes, through the

affidavit of its Executive Director, that it received the summons and complaint, reviewed the documents, and responded to the lawsuit by retaining counsel and filing a Motion to Dismiss. Under every relevant legal standard, actual notice is the central and dispositive inquiry, and technical defects do not warrant dismissal where the defendant has received the information necessary to defend the action. Defendant's attempt to elevate form over substance not only contradicts established law but threatens to undermine the ESA's enforcement structure, which Congress designed to prevent procedural loopholes from shielding violators.

The Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), provides the foundational principle that governs this issue. There, the Court held that due process requires only that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." Due process does not demand perfect or ideal service, nor does it permit defendants to invalidate service simply because the precise method used deviated from strict formal requirements. Instead, the Constitution requires only a practical approach: Was the defendant informed of the lawsuit? Could the defendant understand the nature of the claims? Was the defendant able to respond? Here, Defendant's Executive Director admits that she found the summons and complaint, reviewed them, and then engaged counsel who filed a detailed Motion to Dismiss. This set of actions confirms beyond dispute that Defendant had actual notice consistent with *Mullane*.

The Seventh Circuit applies this principle not as an abstract doctrine but as a concrete rule: technical defects in service do not justify dismissal when the defendant has received actual notice and suffers no prejudice. In *Troxell v. Fedders of North America,*

*Inc.*, 160 F.3d 381 (7th Cir. 1998), the court held that a Rule 12(b)(5) motion must be denied when a defendant received the complaint and was able to respond, even if the method of service was imperfect. The Seventh Circuit emphasized that dismissal is a drastic remedy appropriate only when a defendant is truly unaware of the suit or prejudiced in some meaningful way. Where there is actual notice—as here—the purpose of Rule 4 has been fulfilled, and dismissal is unwarranted.

Indiana law is even more explicit. Indiana Trial Rule 4.15(F) states: "No summons shall be set aside or service held insufficient when … the person served received actual notice of the action." The rule codifies the same policy articulated in *Mullane* and repeatedly reaffirmed by federal courts: actual notice trumps technicalities. This rule exists to prevent precisely the kind of procedural gamesmanship Defendant attempts here, where a party who fully understands the nature of the action seeks dismissal merely because service was imperfect. Indiana courts interpret Rule 4.15(F) broadly to ensure that litigants are not unfairly deprived of judicial review due to minor procedural issues.

In this case, Defendant cannot claim surprise, confusion, or prejudice. Defendant's Executive Director located the summons and complaint at the facility, reviewed them, provided them to counsel, and promptly moved to dismiss. This chain of events demonstrates that Defendant received the information in time to respond effectively. Defendant does not allege that it missed any deadlines, lost the opportunity to raise defenses, or suffered any disadvantage attributable to the manner of service. In fact, Defendant's detailed and comprehensive Motion to Dismiss confirms that it had ample time to prepare and present its arguments.

Moreover, the Federal Rules of Civil Procedure strongly favor adjudication on the merits rather than dismissal on procedural grounds. Rule 4 is not intended to serve as a trapdoor allowing defendants to escape litigation through formal defects unrelated to their ability to defend the case. The Seventh Circuit has repeatedly recognized that dismissal under Rule 12(b)(5) is inappropriate where plaintiffs act in good faith and defendants are aware of the litigation. Dismissal would be especially inappropriate in the ESA context, where Congress intended for private enforcement to serve as a powerful safeguard against ongoing harm to endangered species. Allowing dismissal here would effectively penalize Plaintiff for circumstances beyond his control while allowing Defendant to avoid scrutiny despite actual knowledge of the claims.

It is also important to note that in ESA citizen-suits, the public interest in enforcing endangered species protections weighs against dismissal for purely technical service issues. Congress enacted the citizen-suit provision to ensure that violations could not be insulated from review through bureaucratic inertia or procedural maneuvering. If facilities could avoid litigation simply by raising technical objections to service—even when fully aware of the action—the ESA's enforcement scheme would be severely weakened. Defendant's reliance on technical service arguments is precisely the kind of obstruction Congress sought to preempt.

In sum, Defendant's service-of-process argument fails because actual notice is undisputed, because Defendant suffered no prejudice whatsoever, because Seventh Circuit law squarely rejects dismissal under these circumstances, because Indiana law expressly prohibits it, and because the policy underpinnings of both the ESA and the Federal Rules of Civil Procedure weigh strongly in favor of allowing the case to proceed

on the merits. Defendant's Motion to Dismiss on this basis should therefore be denied.

## CONCLUSION AND PRAYER FOR RELIEF

For all the reasons set forth above, Defendant's Motion to Dismiss is legally and factually unsupported and must be denied. Plaintiff has alleged multiple, independently sufficient injuries—emotional, aesthetic, scientific, informational, professional, and genetic—each directly traceable to Defendant's ongoing and continuing violations of the Endangered Species Act. Defendant's sterilization of the four endangered tigers threaten to permanently destroy essential biological functions, extinguish entire genetic lines that Plaintiff bred and documented, and interfered with Plaintiff's long-standing scientific and conservation work. Defendant's continued confinement and exhibition of the animals under stressful, behavior-suppressing conditions constitutes a daily, ongoing "take" in violation of 16 U.S.C. § 1532(19).

The ESA's text, structure, legislative history, and judicial interpretation all compel a broad, protective view of standing and citizen enforcement. Plaintiff's allegations fall squarely within the core interests the ESA was enacted to safeguard. Federal precedent confirms that the injuries Plaintiff suffers—each of which is concrete and particularized—are more than sufficient to confer Article III standing. Defendant's arguments to the contrary misstate the law, misapply inapposite cases, and disregard binding authority from the Supreme Court, multiple Courts of Appeals, and numerous ESA enforcement actions involving captive animals.

Defendant's procedural challenge to service of process is equally meritless. Defendant indisputably received actual notice of this lawsuit, reviewed the summons and complaint, retained counsel, and filed a Motion to Dismiss. Under *Mullane*, *Troxell*, and Indiana

Trial Rule 4.15(F), actual notice cures any alleged technical defect, and dismissal on this basis would contradict the fundamental purpose of the Federal Rules of Civil Procedure—to resolve cases on the merits, not through procedural gamesmanship.

Because Plaintiff has adequately stated a claim under the ESA and has demonstrated the existence of continuing violations that cause him ongoing injury, dismissal would be improper. The ESA requires courts to apply its protections with "the highest of priorities," and to resolve doubts in favor of endangered species. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978). Allowing this case to proceed is necessary both to vindicate Plaintiff's individual rights and to fulfill Congress's mandate that endangered species be protected against ongoing harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. **Deny Defendant's Motion to Dismiss in its entirety;**

2. **Declare that Defendant's sterilization, confinement, and exhibition practices constitute an ongoing "take" of endangered species in violation of the Endangered Species Act, 16 U.S.C. § 1531 et seq.;**

3. **Issue injunctive relief requiring Defendant to cease all conduct constituting harassment, harm, or wounding under the ESA, including but not limited to:**

    a. housing the tigers in inadequate or psychologically harmful enclosures;

    b. exhibiting the tigers under stressful, behavior-suppressing conditions;

    c. failing to provide adequate environmental enrichment, nutrition, veterinary care, and opportunities for natural behaviors;

4. **Award Plaintiff reasonable attorney's fees and costs** pursuant to 16 U.S.C. § 1540(g)(4);

5. **Grant any further relief the Court deems just and proper** to remedy and prevent ongoing ESA violations.

Date: November 14, 2025                                Respectfully submitted,
                                                       /s/ Roger Roots
                                                       Roots Justice
                                                       10 Dorrance Street, Suite 700
                                                       Providence, Rhode Island 02903
                                                       (662) 665-1061